**ORIGINAL**

**FILED**

# In the United States Court of Federal Claims

No. 14-937C
(Filed: March 25, 2015)

MAR 2 5 2015

U.S. COURT OF
FEDERAL CLAIMS

| | | |
|---|---|---|
| **ROBERT DOURANDISH,** | ) ) ) | Dispute over allowance of deferred compensation costs claimed under a cost-plus-fixed-fee contract; |
| Plaintiff, | ) ) | jurisdiction; privity of contract; third-party beneficiary of a contract; |
| v. | ) ) | constitutional and civil rights claims |
| **UNITED STATES,** | ) ) ) | |
| Defendant. | ) ) | |

Robert Dourandish, *pro se*, San Mateo, California.

P. Davis Oliver, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Joyce R. Branda, Acting Assistant Attorney General, Washington, D.C., and Robert E. Kirschman, Jr., Director, and Reginald T. Blades, Jr., Assistant Director, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case arises from the same events as another case currently pending in this court, *Quimba Software, Inc. v. United States*, __ Fed. Cl. __, 2015 WL 496151 (Feb. 5, 2015). In that case, Quimba Software, Inc. ("Quimba Software" or "Quimba") brought a claim regarding deferred compensation costs that were disallowed by an Administrative Contracting Officer in connection with a cost-plus-fixed-fee contract with the Air Force Research Laboratory, Air Force Material Command. *Id.*, at *1. The Administrative Contracting Officer considered that deferred compensation costs were not allowable under a provision of the Federal Acquisition Regulation then in effect, 48 C.F.R. ("FAR") § 31.205-6(b)(2)(i) (2002). *See Quimba Software*, __ Fed. Cl. at __, 2015 WL 496151, at *2.[1] The deferred compensation costs pertained to Quimba

---

[1]The regulation that was in effect at the time of the initiation of Quimba Software's contract stated:

Software's founders and owners. *Id.* at __, 2015 WL 49151, at *1. Plaintiff, Robert Dourandish, is a co-founder of Quimba Software and has brought this separate action as an individual, also challenging the government's disallowance of the deferred compensation that Quimba Software included in its costs for 2004. *See* Compl. Pending before the court is the government's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss ("Def.'s Mot.") at 1.

## BACKGROUND[2]

On July 10, 2003, Quimba Software entered into a Cost-Plus-Fixed-Fee contract, number F30602-03-C-0185, with the Air Force Research Laboratory, Air Force Material Command for research in Metasearch Fusion Software. Compl. ¶ 4; A 1-17 (Contract No. F30602-03-C-0185 (July 10, 2003)).[3] Quimba Software had previously performed similar research under a Small Business Innovation Research ("SBIR") award and the Contract reflected a modification of Quimba Software's former SBIR proposal. Compl. ¶¶ 4-6. The total estimated contract value was $199,950. Compl. ¶ 6. The contract provided that Quimba Software would submit invoices or vouchers "to the cognizant Defense Contract Audit Agency ('DCAA') office." A 10. The government would then "make payments to the [c]ontractor [when requested as work progresses]

> For closely held corporations, compensation costs covered by
> this subdivision shall not be recognized in amounts exceeding
> those costs that are deductible as compensation under the
> Internal Revenue Code and regulations under it.

FAR § 31.205-6(b)(2)(i) (2002). An auditor had instead cited a provision that was in effect the following year, which provided:

> For owners of closely held companies, compensation in excess
> of the costs that are deductible as compensation under the Internal
> Revenue Code (26 U.S.C.) and regulations under it is unallowable.

FAR § 31.205-6(a)(6)(iii) (2003). *See Quimba Software*, __ Fed. Cl. at __, 2015 WL 496151, at *2.

Quimba Software did not pay wages to its two co-owners, one of whom was Mr. Dourandish, between January 1, 2004, and December 31, 2004, but rather deferred payment until it received adequate funds. Compl. at 1. Mr. Dourandish avers that the government did not allow Quimba Software to submit any vouchers during 2004, because the government had not approved the company's accounting systems. *Id.*; *see also Quimba Software*, __ Fed. Cl. at __, 2015 WL 496151, at *1. Thus, Quimba Software did not pay its co-founders in 2004 for their work during that year.

---

[2]This recitation of background information is taken from the complaint and the parties' submissions on the government's motion and does not constitute findings of fact.

[3]Attachments to the government's motion were paginated consecutively and shall be denoted as follows: "A __."

2

. . . in amounts determined to be allowable by the Contracting Officer in accordance with [FAR] subpart 31.2 in effect on the date of this contract and the terms of this contract." Def.'s Mot. at 3 (citing A 12).[4]

At the outset of the contract, Quimba Software did not have DCAA-approved indirect cost rates or a DCAA-approved cost accounting system, circumstances that Quimba disclosed to the Air Force Research Laboratory's Contracting Officer. Compl. ¶ 8. During a review by DCAA, Quimba Software proposed a $75 per hour rate for the technical staff. Compl. ¶ 9. The DCAA did not object and the contract was awarded to Quimba Software conditional on Quimba's working to remedy deficiencies that had been noted by DCAA. Compl. ¶¶ 9, 13.

On February 3, 2004, a DCAA's assigned audit supervisor informed Quimba Software by e-mail that Quimba would not be paid for its work until its indirect rates were approved by DCAA, which required an accounting system deemed "adequate" by DCAA. Compl. ¶ 14. Quimba accordingly modified its accounting system to comply with DCAA's recommendations, enlisting the aid of an accounting firm in Colorado with experience in working with DCAA. Compl. ¶ 15. The revisions were completed, and in February 2004, DCAA approved a payment to Quimba in the amount of $30,321.77 for costs incurred in 2003, after which Quimba submitted a voucher and filed its indirect-rate proposal to trigger a follow-on audit. Compl. ¶¶ 16-17. During the audit, the auditor asserted that deferred salaries were not allowable under the cost accounting standards. Compl. ¶ 19. Quimba Software disagreed, taking the position that applicable FAR clauses allowed Quimba to include deferred salaries as a component of its cost calculations. See Compl. ¶¶ 19, 35-38.

For the remainder of 2004, Quimba Software remained in ongoing discussions with various DCAA auditors and audit supervisors regarding its deferral of its founders' salaries due to a lack of funds to pay them. See Compl. ¶¶ 25-92. Throughout this period, Quimba continued performance on the contract and worked with its consultants to resolve deficiencies. Compl. ¶¶ 41, 48. In September 2004, DCAA completed a third audit of Quimba and again contended that the deferred salaries were unallowable. Compl. ¶¶ 30-31. After several conversations with multiple DCAA auditors, on October 9, 2004, Mr. Dourandish on behalf of Quimba Software wrote a letter to DCAA outlining his position. Compl. ¶¶ 35-38. On October 21, 2004, the auditor notified Quimba that an audit supervisor would be taking over the matter, and on November 6, 2004, the DCAA audit supervisor began discussions with Quimba and its accounting consultants and ultimately approved Quimba's indirect rates on November 24, 2004, including its deferred compensation. Compl. ¶¶ 39-42.

Subsequently, Quimba Software's case was re-assigned to the previous auditor. Compl. ¶ 44. On January 26, 2005, the auditor presented Quimba with a draft audit report for comment, again raising the issue of the deferred salaries as unallowable. Compl. ¶ 47. After Quimba requested the involvement of the Administrative Contracting Officer ("ACO"), an official of the Defense Contract Management Agency ("DCMA"), on February 8, 2005, Quimba's case was

---

[4]FAR Subpart 31.2 governs "Contracts with Commercial Organizations." The payments to Quimba would be made pursuant to FAR § 52.216-07, relating to "Allowable Cost and Payment," which provision was incorporated in the contact by reference. A 12.

3

reassigned to a different auditor. Compl. ¶¶ 49-51. On February 9, 2005, at the ACO's request, the DCAA initiated a Risk Review of Quimba Software on the basis that Quimba's founders were "not paying" themselves. Compl. ¶ 52. A series of e-mail and telephone exchanges ensued, resulting in a hold of the Risk Review at the ACO's request on February 28, 2005. Compl. ¶¶ 53-56.

Quimba Software completed performance of the contract in March 2005. Compl. ¶ 57. On March 17, 2005, DCAA found Quimba's accounting systems to be adequate without restrictions. Compl. ¶ 59. Quimba then submitted vouchers for all of the work it had performed. Compl. ¶ 61. On April 11, 2005, a DCAA audit supervisor informed Mr. Dourandish that she had received and approved Quimba's vouchers, and they were paid in 2005. Compl. ¶¶ 62-63. On May 31, 2005, Quimba submitted an interim-rates proposal to DCAA for 2005, which included all of the deferred costs, and the proposal was approved by DCAA on June 24, 2005. Compl. ¶¶ 64-66.

In May 2007, the government initiated an audit of Quimba Software's fiscal year ("FY") 2004 incurred-cost proposal. Compl. at 1, ¶ 67. The same assigned auditor who had been removed twice before deemed all salaries earned by Quimba co-founders during FY 2004 to be unallowable in a draft audit report delivered to Quimba on July 17, 2007 and requested a response from Quimba by the following business day. Compl. at 1-2, ¶ 70. Mr. Dourandish contacted the DCAA audit supervisor to request additional time but his request was denied, and DCAA forwarded the final audit report to DCMA for action. Compl. ¶¶ 71-72.

In November 2008, a new ACO assigned to the case contacted Quimba Software to request a response to the DCAA report. Compl. ¶ 73. After a series of communications, on March 4, 2011, the ACO issued a Contracting Officer's Final Decision formally upholding the auditor's recommendations disallowing Quimba's 2004 deferred salaries. Compl. ¶ 74. The ACO's Final Decision claimed that Quimba owed the federal government $91,992.77 and informed Quimba that it had the option of requesting a debt deferral. Compl. ¶¶ 75-77. Quimba did not request a deferral, reasoning that "it assumed that the ACO [would] . . . investigate and then correct his own error once informed of the error." Compl. ¶ 78.

On March 7, 2011, the Defense Financing and Accounting Service issued Bill of Collection 11066130630C1 in response to the ACO's Final Decision, and on June 3, 2011, it sent an e-mail demanding payment for the levied debt. Compl. ¶¶ 79-80. Quimba responded by letter on June 10, 2011, disputing the validity of the debt. Compl. ¶ 82. In the following months, Quimba communicated with the Defense Financing and Accounting Service and attempted to resolve the dispute, without success. Compl. ¶¶ 82-92.

On March 1, 2012, Quimba Software filed its suit in this court, No. 12-142C, currently pending before Judge Williams. See *Quimba Software*, __ Fed. Cl. at __, 2015 WL 496151, at *3. Quimba secondarily filed a complaint with the Small Business Administration in August 2012. Compl. ¶ 94. On October 3, 2014, Mr. Dourandish separately filed the instant suit. In his complaint, he alleges that "[t]he [g]overnment breached its contract with Quimba when it failed to permit the company to invoice . . . the direct rates the [g]overnment had negotiated[] while the company's accounting systems and methods were being reviewed" and when it

"disallowed the salaries the founders had deferred during FY 2004." Compl. ¶¶ 101-102. Mr. Dourandish maintains that the ACO was "grossly negligent" in its review of the auditor's recommendation. Compl. at 2. In particular, Mr. Dourandish emphasizes that the ACO upheld the auditor's decision rather than remanding for further review even though the auditor's "native language is not English," resulting in his confusion between the words "deductible" and "deducted," and the auditor applied the wrong version of the applicable FAR. Compl. at 2. He suggests that the gross negligence was the result of the government "knowingly foster[ing] a set of practices that encourage [g]overnment employees to protect other [g]overnment employees" in order to reap "organizational and personal gains." Compl. ¶¶ 103, 107. Additionally, Mr. Dourandish avers that the government's refusal to correct the errors and its actions to move the litigation forward violated his due process rights under the Fourteenth Amendment of the United States Constitution, *see* Pl.'s Resp. to Government's Mot. to Dismiss ("Pl.'s Opp'n") at 13, ECF No. 9, and his rights codified under the "Civil Rights Act," by "unjustly interfering with his ability to seek federal contracts," Compl. ¶ 109. He claims that as a direct result, his "source of livelihood[] has become defunct" and he has suffered "total loss of any appreciation in Quimba's market valuation[] and total loss of the prospect of a meaningful exit . . . [from his] decade of effort he devoted to building Quimba." Pl.'s Opp'n at 4-5. In terms of relief, Mr. Dourandish requests "five million dollars in direct, consequential, and punitive damages" in addition to "costs and any other relief the [c]ourt deems appropriate." Compl. at 15.

Following the submission of the government's motion and Mr. Dourandish's response, the case is ready for disposition.

## STANDARDS FOR DECISION

"[A] court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." *Hardie v. United States*, 367 F.3d 1288, 1290 (Fed. Cir. 2004) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002)) (internal quotation marks omitted). When evaluating a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the court will "normally consider the facts alleged in the complaint to be true and correct." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). It is the plaintiff's burden to "allege in his pleading the facts essential to show [subject matter] jurisdiction" by a preponderance of the evidence. *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *see also Reynolds*, 846 F.2d at 748.

As part of its inquiry into subject matter jurisdiction, a court must determine whether a plaintiff has standing to sue. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *see also Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The standing requirements applied by this court are the same as those pertaining to federal district courts. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)). To establish standing, a party seeking to invoke federal court jurisdiction must demonstrate: (1) an actual or imminent "injury in fact" that is concrete and particularized; (2) a causal connection between the injury and the challenged action of the defendant, as opposed to that of an independent third party; and (3) a likelihood that

the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

Mr. Dourandish invokes the Tucker Act, 28 U.S.C. 1491(a), as the basis for this court's jurisdiction over his claims. Compl. ¶ 3. The Tucker Act confers jurisdiction on this court to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act waives sovereign immunity, authorizing a claimant to sue the United States for monetary damages. *United States v. Mitchell*, 463 U.S. 206, 216 (1983). However, the Tucker Act alone does not provide a substantive right to monetary relief against the United States. *United States v. Testan*, 424 U.S. 392, 398 (1976); *see also Martinez v. United States*, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc). "A substantive right must be found in some other source of law." *Mitchell*, 463 U.S. at 216. To invoke jurisdiction under the Tucker Act, the plaintiff must establish an independent right to monetary damages by identifying a substantive source of law that mandates payment from the federal government for the injury suffered. *Testan*, 424 U.S. at 400; *see also Ferreiro v. United States*, 501 F.3d 1349, 1351-52 (Fed. Cir. 2007) (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part)).

## ANALYSIS

The government has questioned this court's juridical power to adjudicate Mr. Dourandish's claims. It first challenges the allegations in Mr. Dourandish's complaint respecting the existence of a contract between him and the United States. "To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government," *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990), or the plaintiff must otherwise "be in privity of contract with the United States," *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003) (citing *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract . . . .")); *see also First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011). Mr. Dourandish's claims derive from the purported breach of the government's contract with Quimba; he has identified no express or implied contract between the United States and him as an individual. *See* Compl. ¶¶ 101-102.[5]

---

[5] Mr. Dourandish signed Quimba Software's contract with the government, but he did so not in his individual capacity but rather on behalf of Quimba. *See* A 1. "[A] corporation is generally considered to be a separate legal entity from its shareholder." *Southern Cal. Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319, 1331 (Fed. Cir. 2005). Accordingly, a shareholder typically lacks standing to assert a breach of contract claim on behalf of the corporation, regardless of his role in the negotiation process or in funding a transaction. *First Annapolis*, 644 F.3d at 1373 (citing *Federal Deposit Ins. Corp. v. United States*, 342 F.3d 1313, 1319 (Fed. Cir. 2003)); *see also Southern Cal. Fed. Sav.*, 422 F.3d at 1332; *cf. Home Sav. of Am. v. United States*, 399 F.3d 1341 (Fed. Cir. 2005) (recognizing narrow exceptions to the general rule that shareholders lack standing to bring claims on behalf of a corporation and concluding that a holding company had standing to sue the government where reciprocal promises were part of an original bargain).

Mr. Dourandish nonetheless maintains that he qualifies as a third-party intended beneficiary because "the [g]overnment intended for [him] to directly benefit from the contract the [g]overnment entered with the company [he] co-founded and co-owned." Pl.'s Opp'n at 5. Third-party beneficiary status, however, is an "exceptional" circumstance, *see Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *opinion amended in other respects on reh'g*, 273 F.3d 1072 (Fed. Cir. 2001), and to prove that status exists, "a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party *directly*," *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (quoting *Glass*, 258 F.3d at 1354) (emphasis added). Specifically, to make a shareholder a third-party beneficiary, "the contract must express the intent of the promissor to benefit the shareholder *personally, independently of his or her status as a shareholder*." *Anderson*, 344 F.3d at 1352 (quoting *Glass*, 258 F.3d at 1353-54) (emphasis in original). In this instance, there is no evidence in the contract between the government and Quimba that indicates that the government intended to benefit Mr. Dourandish personally. The contract outlines an agreement obliging the government to pay Quimba Software for work performed. *See* A 1-17 (Contract No. F30602-03-C-0185 (July 10, 2003)). Beyond the signature line, it makes no reference whatsoever to Mr. Dourandish. *See id.* Accordingly, any benefit Mr. Dourandish derived under the contract based on his ownership interest in Quimba Software or his salary earned from Quimba for work performed on the project was indirect and not independent of his status as the co-founder, employee, and shareholder of Quimba. *See* Def.'s Mot. at 7. In sum, because Mr. Dourandish does not qualify as a third-party beneficiary under the contract, he lacks standing to pursue his contract claims. *See, e.g., Anderson*, 344 F.3d at 1352 ("Without either direct privity or third-party beneficiary status, the [plaintiffs] lack standing to sue the government."); *Glass*, 258 F.3d at 1354; *Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994) ("The court carefully must distinguish between incidental and indirect beneficiaries and direct beneficiaries, only the latter of which qualify for third-party beneficiary status.").

Mr. Dourandish additionally alleges constitutional claims that he avers fall within the court's jurisdiction under the Tucker Act. First, Mr. Dourandish claims that the government violated his due process rights under the Fourteenth Amendment when it "*knowingly* refused to rescind an erroneous levy." Pl.'s Opp'n at 13 (emphasis in original). This claim does not fall within the court's jurisdiction because it does not rest on a money-mandating source. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (noting that the Fourteenth Amendment does not mandate the payment of money); *see also Miller v. United States*, 67 Fed. Cl. 195, 199 (2005) ("Although this court may exercise jurisdiction over claims 'founded . . . upon the Constitution,' the scope of this court's jurisdiction over constitutional claims is limited to claims arising under provisions of the Constitution that mandate the payment of money.") (citing 28 U.S.C. § 1491(a)(1)).

Alternatively, Mr. Dourandish raises a claim premised on the Fifth Amendment based on an illegal-exaction theory. *See* Pl.'s Opp'n at 16. An illegal exaction generally involves money that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (1967)); *see also Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996) ("[A]n illegal

exaction has occurred when 'the [g]overnment has the citizen's money in its pocket.'") (quoting *Clapp v. United States*, 117 F. Supp. 576, 580 (Ct. Cl. 1954)). "The Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas*, 77 F.3d at 1573. The statute or provision resulting in the exaction must also provide "either expressly or by 'necessary implication' that 'the remedy for its violation entails a return of money unlawfully exacted.'" *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)). Here, Mr. Dourandish's claims do not derive from the government's exercise of an "asserted statutory power" but rather the government's claim of a debt owed under a contract. *Aerolineas Argentinas*, 77 F.3d at 1573. Therefore Mr. Dourandish's claims based on an alleged illegal exaction do not fall within the court's jurisdiction pursuant to the Tucker Act.

Finally, Mr. Dourandish posits statutory claims by contending that the government violated the Civil Rights Act by "unjustly interfering with his ability to seek federal contracts." Compl. ¶ 109. However, Mr. Dourandish's claims of purported civil rights violations essentially amount to contract claims, including claims for consequential damages, addressed *supra*. *See* Pl.'s Opp'n at 18 ("[T]he issue, which is likely framed poorly as a [c]ivil [r]ights claim . . . is equally valid if framed as an [i]nterference with a [c]ontract claim."). Even if Mr. Dourandish were to articulate an appropriate civil rights claim, such a claim would not be properly before the court because this court may not adjudicate claims alleging civil rights violations. *See* 28 U.S.C. § 1343(a)(4) ("The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."); *Taylor v. United States*, 80 Fed. Cl. 376, 381 (2008), *aff'd*, 310 Fed. Appx. 390 (Fed. Cir. 2009) ("Congress never intended for the United States Court of Federal Claims to have jurisdiction over claims brought under Title VII."); *see also Cottrell v. United States*, 42 Fed. Cl. 144, 149 (1998) ("As courts have repeatedly held, there is no Tucker Act jurisdiction in the Court of Federal Claims to entertain claims involving race, sex, and age discrimination or other claims involving civil rights violations.").

In sum, Mr. Dourandish has not stated a claim within the jurisdiction of this court.

## CONCLUSION

For the reasons stated, the government's motion to dismiss is GRANTED, and Mr. Dourandish's complaint is dismissed pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. The clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

Charles F. Lettow
Judge